# Exhibit 1

# MUTUAL NDA

THIS MUTUAL NON-DISCLOSURE AGREEMENT (this "Agreement") is made and entered into as of January 16, 2018 between **Smart Theater LLC,** with a headquarter office at 7040 Jellico Ave., Van Nuys, CA, 91406  and **DigiBit LLC,** with a headquarter office at 15074 Cranbrook Court, Shelby Township, MI 48315, collectively "the Parties" for the purpose of exploring a business opportunity to create, promote and sell gaming products and services, and in connection with this opportunity wishes to execute this Non Disclosure Agreement ("Agreement").

## 1. Nature of the Confidential Information:

Smart Theater LLC specializes in electronic game and toy development and marketing thereof. DigiBit LLC specializes in electronics hardware, communications and software for the toy and gaming industries. Specifically Smart Theater LLC wishes to explore an engagement with DigiBit LLC to aid in the development and/or enhance the games and toys Smart Theater LLC already sells or intends to sell with DigiBit LLC patent pending wearable gaming technology described as follows from the patent application:

*The invention relates to an electronic game assembly. More particularly, the invention relates to wearable electronic game assembly capable of communicating with other wearable electronic game assemblies.*

## 2. Confidential Information:

Confidential information means any information disclosed to by one Party to the other, either directly or indirectly in writing, orally or by inspection of tangible or intangible objects, including but not limited to; documents, photos, product samples, business plans, software, financial analysis, marketing plans, customer data or information as it relates to the Parties' products and related marketplace information. Confidential Information may also include information disclosed to either party by third parties at the direction of the Disclosing Party at that time.

## 3. Non-use and Non-disclosure:

Both Parties agree not to use any Confidential Information for any purpose except to evaluate and engage in discussions concerning a potential business relationship between the parties hereto. Both Parties agree not to disclose any Confidential Information to third parties or to its employees, except to those employees or third parties who are required to have the information in order to evaluate or engage in discussions concerning the contemplated business relationship.

**4. Maintenance of Confidentiality Information:**

Both Parties agree that each shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of the Confidential Information. Without limiting the foregoing, each Party shall take at least those measures that either/both of the Parties takes to protect its own most highly confidential information and shall have its employees and/or third parties, if any, who have access to Confidential Information sign a non-use and non-disclosure agreement in content substantially similar to the provisions hereof, prior to any disclosure of Confidential Information to such employees and third parties. Neither of the Parties shall not make any copies of Confidential Information unless the same are previously approved in writing by the other Party. The Receiving Party shall reproduce the Disclosing Party's proprietary rights notices on any such approved copies, in the same manner in which such notices were set forth in or on the original. The Receiving Party shall immediately notify the Disclosing Party in the event of any unauthorized use or disclosure of the Confidential Information.

**5. No Obligation:**

Nothing herein shall obligate either of the Parties to proceed with any transaction between them, and each of the Parties reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning the business opportunity at any time and for any reason.

**6. No Warranty:**

ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS". NEITHER OF THE PARTIES MAKES ANY WARRANTIES, EXPRESS, IMPLIED OR OTHERWISE, REGARDING ITS ACCURACY, COMPLETENESS OR PERFORMANCE.

**7. Return of Materials:**

All documents and other tangible objects containing or representing Confidential Information and all copies thereof which are in the possession of either of the Parties shall be and remain the property of the Disclosing Party and shall be promptly returned to the Disclosing Party upon the Disclosing Party's request.

**8. Term:**

The obligations of each receiving party hereunder survive any termination of this Agreement and shall continue for a period terminating on the later to occur of the date (i) five (5) years following the date of this Agreement or (ii) three (3) years from the date on which Confidential Information is last disclosed under this Agreement.

**9. Remedies:**

Both Parties agree that any violation or threatened violation of this Agreement will cause irreparable injury to the Disclosing Party, entitling the Disclosing Party to obtain injunctive relief in addition to all legal remedies.

**10. Miscellaneous:**

This Agreement shall bind and inure to the benefit of the parties hereto and their successors and assigns. This Agreement shall be governed by the laws of Delaware, without reference to conflict of laws principles. This document contains the entire agreement between the parties with respect to the subject matter hereof. Any failure to enforce any provision of this Agreement shall not constitute a waiver thereof or of any other provision hereof. This Agreement may not be amended, nor any obligation waived, except by a writing signed by both of the Parties hereto. Any and all disputes arising under or related to this Agreement shall be adjudicated exclusively in the State of Delaware, USA. Both of the Parties have willingly executed this Nondisclosure Agreement as of the date first above written by virtue of their signatures below.

By: _____     Date: 1-16-2018 _____

**Chuck Seltzer for Smart Theater LLC**

Title: President & COO

By: _____     Date: 1-16-2018 _____

**Colt Correa for DigiBit LLC**

Title: CEO

Exhibit 2

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kay A. Cusle*

United States Register of Copyrights and Director



**Registration Number**

## TXu 2-152-784

**Effective Date of Registration:**
June 28, 2019

---

## Title

| | |
|---|---|
| **Title of Work:** | Untitled |

## Completion/Publication

| | |
|---|---|
| **Year of Completion:** | 2017 |

## Author

| | |
|---|---|
| • **Author:** | DigiBit, LLC |
| **Author Created:** | computer program |
| **Work made for hire:** | Yes |
| **Citizen of:** | United States |

## Copyright Claimant

| | |
|---|---|
| **Copyright Claimant:** | DigiBit, LLC |
| | 15074 Cranbrook Court, Shelby Township, MI, 48315, United States |

## Rights and Permissions

| | |
|---|---|
| **Organization Name:** | Simonelli IP, PLLC |
| **Name:** | David Simonelli |
| **Email:** | david@simonelliip.com |
| **Telephone:** | (248)252-7435 |
| **Address:** | PO Box 935 |
| | Birmingham, MI 48012 United States |

## Certification

| | |
|---|---|
| **Name:** | David J. Simonelli |
| **Date:** | June 28, 2019 |
| **Applicant's Tracking Number:** | 0110.3007.1 |

# Exhibit 3

## MUTUAL CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT
## As of October 2, 2018

This Mutual Confidentiality And Nondisclosure Agreement (the "Agreement"), is made and entered into as of October 2, 2018 (the "Effective Date"), by and between Arkade, Inc., a Delaware corporation with its principal place of business located at 7040 Jellico Ave. Van Nuys, CA 91406 , on behalf of itself and its applicable affiliates (together "Company"), and Digibit, LLC., a Michigan Domestic Limited Liability Company with its principal place of business located at 15074 Cranbrook Court, Shelby Township, Michigan 48315 ("Discloser"), together ("Parties") and individually a ("Party").

WHEREAS, Company and Discloser have entered into negotiations concerning a potential business relationship whereby the Company would acquire Intellectual Property (as defined and set forth below) currently owned by Discloser (the "Proposed Transaction") that will require and may continue to require the Parties to disclose certain confidential and/or otherwise proprietary information to each other; and

WHEREAS, the parties wish to protect, pursuant to this Agreement, such confidential information.

NOW, THEREFORE, the parties, intending to be legally bound hereby, agree as follows:

1. This Agreement shall apply to all Confidential Information (as set forth below) and disclosed by or on behalf of (i) Company to Discloser, or (ii) Discloser to Company (including, without limitation, each Party's officers, directors, employees, agents, and other representatives).

2. The parties acknowledge and agree that "Confidential Information" in whatever form disclosed hereunder, including, without limitation, written, electronic, digital, visual, physical, audible or oral, includes;

   (i) information concerning any of a Party's customers, clients, or vendors;
   (ii) information referring to, discussing, or in any way related to a Party's business condition, methods, processes, designs, customer lists, strategies or initiatives, systems, processes, and/or policies;
   (iii) information regarding Intellectual Property Rights (as set forth below), proprietary technology and systems, including proprietary ideas, designs, schematics, prototypes, software, code, developer manuals and the like and/or contemplated products and services, research and development, production, costs, profit and margin information;
   (iv) any other information that a Party designates as confidential. The Parties further acknowledge and agree that Confidential Information also includes any reports, memos, notes, summaries, abstracts, or drafts of Confidential Information or of oral presentations, reports, or discussions referring to, describing, elaborating upon, or otherwise relating to Confidential Information;
   (v) "Intellectual Property Rights" shall mean any and all commercial, industrial and/or intellectual property rights of whatever nature, including but not limited to: (a) patent rights and/or any applications pending for such rights (including, without limitation, registrations, all reissues, continuations, divisions, continuations-in-part, renewals or extensions thereof); (b) registered and common law trademarks, trade dress and service marks, trademark applications, service mark applications, trade names, logos and domain names; (c) work of authorship (including software, websites, databases and other compilations whether copyrightable or not), registered copyrights and copyright applications; (d) trade secrets, technology and know-how (including, without limitation, electrical schematics, software source code, printed circuit board designs, electrical bill of materials, Unity game projects, manufacturing software, cyber security licensing software, communications software, Federal Communications Commission certifications and patent rights market research, business plans, technical information, manufacturing information, product cost and pricing, processes, models, designs and customer lists); and (e) all such rights as set forth above, together with any amendments, modifications and supplements thereto and all goodwill associated with any of such patents, copyrights, trademarks, service marks, and trade names, as well as the right to apply for such rights and/or any applications pending for such rights wherever in the world directly or indirectly relating to the development, research, manufacturing and/or commercialization of such interests by either Party.

3. Each Party hereto acknowledges that, in connection with the Proposed Transaction, the other Party has provided, and from time to time may continue to provide, Confidential Information to the other Party in confidence and solely for the purpose of evaluating, negotiating, or otherwise discussing the Proposed Transaction. Each Party represents and warrants that it has treated, and will continue to treat, all Confidential Information of the other Party as confidential and secret and that it has not disclosed or permitted access to, and will not disclose or permit access to, such Confidential Information except as permitted under this Agreement. Each Party acknowledges and agrees that (i) each Party claims and reserves all rights afforded under all applicable privacy, intellectual property, and trade secret laws, regulations, and rulings in all Confidential Information furnished to the other Party; (ii) a Party is granted only a limited right of use of Confidential Information, as specified above, which right is revocable at will by the Party granting such use and not coupled with any interest in the Confidential Information; (iii) this Agreement shall not effect any transfer of right, title, or interest in or to any Confidential Information; (iv) a Party shall not assert any right, title, or interest in any Confidential Information of the other Party; and (v) neither Party grants any license under any patents, trademarks, service marks or copyrights under this Agreement.

4. Each Party hereto agrees: (i) to protect any and all Confidential Information from unauthorized use or disclosure with at least the same degree of care such Party uses to protect its own confidential information of a similar nature, but in no case less than a commercially reasonable degree of care; (ii) to use the Confidential Information only for the purpose(s) expressly set forth in, and in accordance with, the terms of this Agreement; (iii) not to copy or reproduce any Confidential Information in any form, except to the extent contemplated by this Agreement; (iv) not to disclose to or otherwise permit any third person or entity access to any Confidential Information except with prior written consent of the Party owning such Confidential Information; (v) to limit disclosure of Confidential Information to those employees, agents, or other representatives of a Party who are necessary for and involved in that Party's performance of its obligations under this Agreement; (vi) to ensure that any of a Party's employees, agents, or other representatives who receive or obtain Confidential Information are advised of the nature of the Confidential Information and of the obligations such Party has undertaken with respect to such information under this Agreement and agree to comply with these obligations; and (vii) to take any and all other steps necessary to safeguard Confidential Information against unauthorized access or disclosure. Each Party further agrees that, to assist the other Party in identifying any access, disclosure, or use of Confidential Information in a manner inconsistent with the provisions of this Agreement, each Party shall, upon request, inform the other Party of all individuals or entities to whom Confidential Information has been disclosed or who otherwise have been afforded access to Confidential Information and provide copies of confidentiality agreements with others upon which the Receiving Party relies in order to comply with this agreement.

5. Information of a Party shall not be deemed Confidential Information if (i) it is already, or otherwise becomes, known to the public other than as a result of any act or omission of the other Party, its officers, directors, employees, agents, or other representatives; (ii) it is lawfully received from a third Party having the right to disseminate the information without restriction on disclosure; or (iii) it is *voluntarily* furnished to others by the Party owning such Confidential Information without restriction on disclosure. A Party shall notify the other Party immediately, both orally and in writing, of any known possession, use, or knowledge of any Confidential Information by any person or entity other than those authorized under this Agreement to receive the information.

6. Upon a Party's (the "Disclosing Party") request at any time and from time to time, or termination of the parties' negotiations or discussions, whichever occurs first, the other Party (the "Receiving Party") shall at the election of the Disclosing Party, either (a) voluntarily surrender all Confidential Information of the Disclosing Party in the Receiving Party's possession, custody, or control (including, without limitation, the Confidential Information in possession, custody, or control of any of the Receiving Party's officers, directors, employees, agents, or other representatives), including, without limitation, any drafts, copies, or other non-originals, or (b) shall insure that all such Confidential Information and any other tangible material containing or reflecting any information in the Confidential Information furnished to the Receiving Party (or any of the Receiving Party's Agents) shall be promptly destroyed, and such destruction shall be promptly certified in writing to the Company by an authorized officer supervising such destruction.

7. Each Receiving Party acknowledges and agrees that the Disclosing Party operates in a highly regulated and competitive environment; and that the unauthorized disclosure or use of Confidential Information will

cause irreparable harm and significant injury to the Disclosing Party which will be difficult to measure with certainty or to compensate through money damages. Accordingly, the Receiving Party agrees that injunctive or other equitable relief shall be appropriate in the event of any breach by the Receiving Party of any part or parts of this Agreement, in addition to such other remedies as may be available at law.

8. The Receiving Party acknowledges and agrees that neither the Disclosing Party, nor its officers, directors, employees, agents, or other representatives (the "Related Parties") has made or will make any representation concerning the accuracy or completeness of Confidential Information; and that neither the Disclosing Party nor any Related Party shall have any liability whatever to the Receiving Party resulting from the Receiving Party's use of Confidential Information.

9. The Receiving Party shall not use the names, trade names, service marks, trademarks, trade dress, or logos of the Disclosing Party in publicity releases, advertising, or any other external communications or public disclosures without the Disclosing Party's prior written consent.

10. The Receiving Party shall indemnify, defend, and hold the Disclosing Party and Related Parties harmless from any actual or threatened legal or administrative action, claim, liability, penalty, fine, assessment, lawsuit, litigation, or other loss, expense, or damage (together "Liability"), including, but not limited to, any reasonable attorneys' fees and costs, that the Disclosing Party or Related Parties may incur arising out of or relating to the Receiving Party's breach of any provision of this Agreement.

11. This Agreement is effective as of the Effective Date. The rights and obligations under this Agreement shall survive its termination and the termination of any negotiations or discussions between the parties in any event for a period of two (2) years.

12. In evaluating, negotiating, or discussing the Proposed Transaction, or in performing its obligations under any agreement to consummate the transaction, each Party shall act solely in the capacity of an independent contractor and not an agent, servant, employee, or representative of the other Party or any related entity. Consequently, each Party will not have, and will not make any statement or take any action that might cause any third Party to believe the other Party has the authority to transact any business, enter into any agreement, or in any way bind or make any commitment on behalf of the first Party or any affiliated entity unless expressly authorized in writing by a duly authorized officer of the first Party.

13. No delay or omission by a Party to exercise any right or power occurring upon any noncompliance or default by the other Party with respect to any of the terms of this Agreement shall impair any such right or power or be construed to be a waiver thereof. A waiver by a Party of any of the provisions of this Agreement shall not be construed to be a waiver of any succeeding breach thereof or of any other provision.

14. Each Party agrees that any action brought under this Agreement shall be exclusively under the jurisdiction of and governed by the laws of the state of such Party's residence and by the laws of the United States.

15. This Agreement constitutes the entire Agreement between the parties with respect to its subject matter and there are no understandings or agreements relative to that subject matter other than those that are explicitly expressed herein.

16. Either Party shall have the unrestricted right to assign, delegate, subcontract, or otherwise transfer any or all of its rights and/or obligations under this Agreement to any parent, subsidiary, or other affiliate, or to any entity that is a successor in interest to any phase of such Party's business. A Party shall not partially or completely assign, delegate, subcontract, or otherwise transfer any of its rights or obligations except with the express, written consent of a duly authorized officer of the other Party.

17. This Agreement may be altered, amended, or otherwise changed only by a written instrument signed by authorized officers of both parties.

18. Nothing in this Agreement shall obligate either of the parties to consummate the Proposed Transaction or otherwise enter into any business relationship. Each Party claims and reserves the right, in its sole discretion and judgment, to terminate all negotiations and discussions with the other.

1001918v.1-bsb

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers as set forth below.

**SmartTheater, LLC**　　　　　　　　　　**Digibit, LLC**

By:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿　　　　By:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
Name: Joel Kort　　　　　　　　　　　　Name: Colt Correa
Title: CEO　　　　　　　　　　　　　　Title: Managing Member

Exhibit 4

# INTELLECTUAL PROPERTY PURCHASE AGREEMENT

## BY AND AMONG

## ARKADE, INC.

## DIGIBIT, LLC

## AND

## COLT CORREA

## Dated as of February 20, 2019

4816-9282-0869.4

# TABLE OF CONTENTS

Page

**ARTICLE 1 PURCHASE AND SALE OF INTELLECTUAL PROPERTY** ...................................................1

SECTION 1.1    DEFINITIONS ...................................................................1
SECTION 1.2    PURCHASE AND SALE OF INTELLECTUAL PROPERTY ...................1
SECTION 1.3    NO LIABILITIES ...............................................................3
SECTION 1.4    FURTHER CONVEYANCES; CONSENTS; NONASSIGNABLE ASSETS ...3

**ARTICLE 2 CLOSING** ...............................................................................................4

SECTION 2.1    CLOSING .........................................................................4
SECTION 2.2    PURCHASE PRICE .............................................................4
SECTION 2.3    ISSUED SHARES ...............................................................5
SECTION 2.4    LIMITED PREEMPTIVE RIGHT ............................................5
SECTION 2.5    CLOSING DELIVERIES ........................................................5

**ARTICLE 3 REPRESENTATIONS AND WARRANTIES** ........................................................6

SECTION 3.1    ORGANIZATION; GOOD STANDING .....................................6
SECTION 3.2    AUTHORITY ......................................................................6
SECTION 3.3    CONSENTS AND APPROVALS ..............................................6
SECTION 3.4    TITLE TO ASSETS .............................................................7
SECTION 3.5    LITIGATION ......................................................................7
SECTION 3.6    INTELLECTUAL PROPERTY ..................................................7
SECTION 3.7    REPRESENTATIONS CONCERNING THE ISSUED SHARES ...........8

**ARTICLE 4 COVENANTS** ..........................................................................................9

SECTION 4.1    ANNOUNCEMENTS .............................................................9
SECTION 4.2    CONFIDENTIALITY ............................................................9
SECTION 4.3    UPDATE OF REPRESENTATIONS AND WARRANTIES ...............10

**ARTICLE 5 SURVIVAL AND INDEMNIFICATION** ..........................................................10

SECTION 5.1    SURVIVAL ......................................................................10
SECTION 5.2    INDEMNIFICATION ...........................................................10
SECTION 5.3    LIMIT OF LIABILITY .......................................................10

**ARTICLE 6 GENERAL PROVISIONS AND OTHER AGREEMENTS** ...................................11

SECTION 6.1    NOTICES .........................................................................11
SECTION 6.2    AMENDMENT; WAIVER ....................................................11
SECTION 6.3    ASSIGNMENT ..................................................................11
SECTION 6.4    ENTIRE AGREEMENT .......................................................12
SECTION 6.5    PARTIES IN INTEREST ....................................................12
SECTION 6.6    FEES AND EXPENSES .......................................................12
SECTION 6.7    WAIVER OF JURY TRIAL ................................................12
SECTION 6.8    MUTUAL DRAFTING ........................................................12
SECTION 6.9    GOVERNING LAW; ARBITRATION .......................................12
SECTION 6.10   COUNTERPARTS ..............................................................13
SECTION 6.11   SEVERABILITY ...............................................................13
SECTION 6.12   INTERPRETATION ............................................................13

ANNEX I          DEFINED TERMS

## INTELLECTUAL PROPERTY PURCHASE AGREEMENT

This Intellectual Property Purchase Agreement (this "Agreement") is dated as of February 20, 2019 by and between Arkade, Inc., ("Purchaser"), DigiBit LLC (the "Company"), and Colt Correa (the "Owner" and, together with the Company, the "Sellers"). Purchaser and Sellers are collectively referred to herein as the "Parties" and each individually as a "Party".

### W I T N E S S E T H:

**WHEREAS**, Sellers are the sole and exclusive legal and beneficial owners of all right, title, and interest in and to the Intellectual Property by ownership, have sole and exclusive control of the Intellectual Property, including all intellectual property rights relating thereto, and have the right to transfer and assign to Purchaser all right, title, and interest in the Intellectual Property free and clear of all Liens;

**WHEREAS**, Sellers agreed to convey, transfer and assign to Purchaser all right title and interest in and to the Intellectual Property;

**WHEREAS**, the Parties wish to further document their existing agreement;

**WHEREAS**, Sellers and Purchaser have entered into that certain license and consulting agreement, dated as of the date hereof (the "License and Consulting Agreement"); and

**WHEREAS**, Sellers are willing to execute and deliver to Purchaser this Agreement together with instruments of assignment in a form recordable with United States state and federal governmental authorities, including the US Copyright Office ("Copyright Office") and the US Patent and Trademark Office ("USPTO") and other national and supranational governmental authorities;

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and undertakings contained herein, the receipt and sufficiency of which are hereby acknowledged, and subject to and on the terms and conditions herein set forth, the Parties, intending to be bound hereby, agree as follows:

### ARTICLE 1
### PURCHASE AND SALE OF INTELLECTUAL PROPERTY

**Section 1.1    Definitions**.  Capitalized terms used and not otherwise defined in this Agreement have the meanings set forth on Annex I.

**Section 1.2    Purchase and Sale of Intellectual Property**.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Sellers shall sell, assign, transfer and convey to Purchaser, and Purchaser shall purchase and acquire from Sellers, free and clear of all Liens, all right, title, and interest throughout the world in and to all of the following, to the extent owned or used by either Seller (the "Intellectual Property"):

(a)    (i) copyrights, including, without limitation, the software listed in the attached Schedule 1, including (A) the software's Source Code and object code, and (B)

all databases, files, application programming interfaces, and other components of and works embodied in the software (including any audio or visual content or screen displays in the user interface), and all updates, upgrades, corrections, modifications, translations, releases, versions and derivative works and improvements of each of the foregoing ("Software"), whether registered or unregistered, arising by any applicable Law of any jurisdiction throughout the world or any treaty or other international convention, (ii) registrations and applications for registration of such copyrights, including the registrations and applications set forth in the attached Schedule 1; and (iii) issuances, extensions, and renewals of such registrations and applications (collectively, "Acquired Copyrights");

(b)     patents and patent applications, in whole or in part, including the patents and patent applications listed in the attached Schedule 2, all patents that issue from such patent applications (including, without limitation, registrations, all reissues, continuations, divisions, continuations-in-part, renewals or extensions thereof), as well as the right to apply for such rights and/or any applications pending for such rights wherever in the world directly or indirectly relating to the development, research, manufacturing and or commercialization by or at the request of Purchaser of the technology and all other technology that comprise the technology suite, ("Patents"), and any patents or patent applications from which any Patents claim priority or that claim priority from any Patents, and all inventions disclosed in any of the foregoing (collectively "Acquired Patents");

(c)     any and all of the following that are not generally known by third parties or in which either Seller has a legally recognized right in, to or under: information, inventions, discoveries, improvements, know-how (including processes, business methods, models, designs and customer lists, software, websites, and all other intellectual or proprietary rights owned or used by Purchaser in connection with Purchaser's business, in each case, together with any amendments, modifications and supplements thereto and all formulas, programs, tools, codes, algorithms, statements, notations, memoranda, comments, descriptions, identifiers, instructions, ideas, concepts, flow charts, drawings, designs, patterns, plans, compilations, data, databases, data collections, devices, procedures, methods, techniques, processes, research, protocols and other content and materials, whether for testing, supplements, or otherwise, including those listed in the attached Schedule 3 (collectively, "Acquired Trade Secrets");

(d)     any databases or data compilations that comprise or are comprised by the Intellectual Property, including all *sui generis* rights in such databases or data compilations in addition to any Copyrights or Trade Secrets relating thereto;

(e)     royalties, fees, income, payments, and other proceeds now or hereafter due or payable to any Seller from any third party with respect to any of the foregoing;

(f)     claims and causes of action with respect to any of the foregoing, whether accruing before, on, or after the Closing Date, including all rights to and claims for

damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, dilution, misappropriation, violation, breach, or default; and

(g)     other rights, assets, privileges, and protections of any kind whatsoever accruing under any of the foregoing provided by any Law (including any treaty or other international convention) throughout the world.

**Section 1.3     No Liabilities**. Purchaser shall neither assume nor be otherwise liable for any obligations, claims, or liabilities of either Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereafter arising (collectively, "Excluded Liabilities"), including, for the avoidance of doubt, any obligations, claims, or liabilities arising from or in connection with any circumstances, causes of action, breach, violation, default, or failure to perform by or of either Seller with respect to the Intellectual Property.  Any and all Excluded Liabilities remain with and are the responsibility of the Sellers and shall remain with and be the responsibility of the Sellers from and after the Closing Date.

**Section 1.4     Further Conveyances; Consents; Nonassignable Assets**.

(a)     From and after the Closing Date, each Seller shall execute and deliver such additional documents, instruments, conveyances, and assurances, and take such further actions as may be  required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the documents to be delivered hereunder, including using best efforts to cause any third party or Affiliate to execute and deliver any such documents, instruments, conveyances, and assurances or to take any such further actions.

(b)     Without limiting the foregoing, to the extent, if any, not executed and delivered to Purchaser with this Agreement, each Seller shall execute and deliver to Purchaser such assignments and other documents, certificates, and instruments of conveyance in a form satisfactory to Purchaser and suitable for filing with the United States Copyright Office ("US Copyright Office") or United States Patent and Trademark Office ("USPTO"), as applicable, and the registries and other recording governmental authorities in all applicable jurisdictions (including with respect to legalization, notarization, consularization, apostille, certification, and other authentication) as necessary to record and perfect the Recordable Assignments, and to vest in Purchaser all right, title, and interest in the Acquired Copyrights and, Acquired Patents in accordance with applicable Law. As between Sellers and Purchaser, Purchaser shall be responsible, at Purchaser's expense, for filing the Recordable Assignments, and other documents, certificates, and instruments of conveyance with the applicable governmental authorities; provided, that each Seller shall take such steps and actions, and provide such cooperation and assistance, to Purchaser and its successors, assigns, and legal representatives, including the execution and delivery of any affidavits, declarations, oaths, exhibits, assignments, powers of attorney, or other documents, as may be necessary to effect, evidence, or perfect the assignment of the Intellectual Property to Purchaser, or any of Purchaser's successors or assigns.

4816-9282-0869.4

## ARTICLE 2
## CLOSING

**Section 2.1    Closing**. The closing for the consummation of the Transactions (the "Closing") shall take place on the date that Purchaser pays the Payment pursuant to Section 2.2 (the "Closing Date"). The Closing may be accomplished by facsimile or email (in .pdf format) transmission to the respective offices of legal counsel for the Parties of the Operative Documents, duly executed where required, delivered upon actual confirmed receipt.  All proceedings to be taken and all documents to be executed and delivered by all Parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed, and delivered.  The Closing shall be deemed to be effective for all purposes at 12:01 a.m., Detroit, Michigan time, on the Closing Date.

**Section 2.2    Purchase Price**.

(a)    The Parties acknowledge and agree that Purchaser shall pay to Owner pursuant to the wire instructions set forth in Schedule 2.2 (the "Payment") to be sent to Owner's counsel, Stroble & Sharp, P.C., to be distributed to Owner only upon full performance of this Agreement as confirmed in writing by counsel for Purchaser:

(i)    if the Payment is paid on or prior to March 30, 2019, $650,000;

(ii)    if the Payment is paid after March 30, 2019 and on or prior to June 15, 2019, $700,000;

(iii)    if the Payment is paid after June 15, 2019 and on or prior to September 30, 2019, $750,000; or

(iv)    if the Payment is paid after September 30, 2019 and on or prior to January 31, 2020, $800,000.

(b)    Upon the payment of the Payment (i), the Closing shall be effective without the further action by any Person, (ii) the sale, assignment, transfer and conveyance of the Intellectual Property to Purchaser shall be complete and irrevocable, and (iii) Purchaser shall have all title to, and all rights in, to and under, the Intellectual Property.

(c)    The Parties agree that, if Purchaser fails to pay the Payment by January 31, 2020, this Agreement shall immediately terminate.  Upon such termination, (i) Seller shall be entitled to retain in full, as liquidated damages, the full amount of the Payment, (ii) Purchaser shall have no further obligations under this Agreement and shall not be liable for any damages in excess of those set forth in the preceding clause (i), and (iii) this Agreement shall terminate in full and be of no further effect.

(d)    The Parties acknowledge and agree that Purchaser has made several periodic payments to Owner to defray ongoing IP development costs, as set forth in Schedule 2.2(d).  Such payments shall be credited to offset the Payment.

4

**Section 2.3     Issued Shares.** Beginning on the on the Closing Date, Owner shall have the option to purchase a number of newly issued shares of the common stock, par value $0.01 per share (the "Common Stock"), of Purchaser equal to 2.5% of the number of 103,000 shares of Arkade (i.e., 2,575 shares).  To exercise this option, Owner shall (a) deliver written notice of his intent to so exercise to Purchaser, (b) execute a joinder, acceptable to Purchaser, to any stockholders' agreement or similar contract binding on the stockholders of Purchaser, (c) execute a pledge agreement in favor of Purchaser, pledging the shares of Common Stock purchased by Owner to satisfy any indemnification obligations Sellers may have under this Agreement, and (d) pay an amount equal to the par value of the shares being purchased.  This option shall, if not fully exercised, expire on the day that is 30 days after the Closing Date.  The shares issued pursuant to this Section 2.3 shall be referred to as "Issue Shares."

**Section 2.4     Limited Preemptive Right**.  Following the purchase of shares of Common Stock pursuant to Section 2.3 above, if any additional shares of Common Stock are issued to the Founders, as that term is defined in that certain Shareholders Agreement dated January 18, 2019, by and between the Purchaser and the Founders, Owner shall be offered the option to purchase or receive (as the case may be) additional shares of Common Stock on the same terms, conditions, and proportions as the Founders to maintain Owner's ownership interest in the Purchaser equal to 2.5% of the ownership interest owned by the Founders in the Purchaser.  (For example, if the Founders own 75% of the outstanding Common Stock of Purchaser, Owner shall be granted the right to purchase/receive additional shares so that Owner's ownership percentage would equal 2.5% of the Founders ownership interest, or 1.875% of the outstanding shares of Common Stock of the Purchaser.)  This Limited Preemptive Right shall expire after an event that reduces the Founders to less than 50% ownership of Purchaser.

**Section 2.5     Closing Deliveries.**  Within five Business Days after the Closing Date, Sellers shall deliver to Purchaser:

(a)     assignments in the form of Exhibit 2.5(a) (the "Recordable Assignments") and duly executed by each Seller, transferring to Purchaser all right, title, and interest in and to all Acquired Copyrights, and Acquired Patents;

(b)     the complete prosecution files, including original registration certificates, for all Acquired Copyrights, and Acquired Patents in such form and medium as requested by Purchaser together with a list of local prosecution counsel contacts, and all such other documents, correspondence, and information as are reasonably requested by Purchaser to register, own, or otherwise use the Intellectual Property, including any maintenance or renewal fees due and deadlines for actions to be taken concerning prosecution and maintenance of all Acquired Copyrights, and Acquired Patents in the one year period following the Effective Date;

(c)     a certificate duly executed by an officer of the Company that certifies (A) to the due adoption by the governing authority of the Company of resolutions attached to such certificate authorizing the Transactions and the execution and delivery of the Operative Documents to which the Company is a party, and (B) that the copies of the certificate of formation and limited liability company agreement of the Company attached to such certificate are true and correct copies of such documents and that such documents have not been amended except as reflected in such copies;

(d)      an opinion of counsel to Sellers, reasonably acceptable to Purchaser, as to (i) the effectiveness and enforceability of this Agreement, (ii) the good standing, organization, existence of the Company, (iii) the authorization of this Agreement by Sellers, and (iv) the ownership, both prior to and after the effectiveness of this Agreement, of the Intellectual Property;

(e)      a Form W-9 of Owner, completed and duly executed by Owner; and

(f)      a certificate of good standing of the Company from the Secretary of State of the State of Michigan dated within 10 days of the Closing Date.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

Sellers, jointly and severally, represent and warrant to Purchaser as of the date hereof and as of the Closing Date that the following are true and correct, regardless of what investigations, if any, that Purchaser shall have made prior hereto:

**Section 3.1    Organization; Good Standing**. The Company is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Michigan.  The Company is not in breach of any provision of its organizational documents.

**Section 3.2    Authority**. The Company has full power and authority to execute, deliver, and perform the Operative Documents to which it is a party and to consummate the Transactions. The execution and delivery by the Company of the Operative Documents to which it is a party, and the consummation of the Transactions, have been duly and validly authorized by the governing authority of the Company and no other proceedings on the part of the Company are necessary with respect thereto. The Owner has the legal capacity to execute, deliver and perform the Operative Documents to which it is a party and to consummate the Transactions. The Operative Documents have been duly and validly executed and delivered by each Seller and, assuming the valid authorization, execution and delivery of each such Operative Document by each other Party thereto, constitute legal, valid, and binding obligations of each Seller, enforceable against them in accordance with their terms, except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium laws, or other similar laws affecting creditors' rights generally and general principles of equity affecting the availability of specific performance and other equitable remedies. Neither the consent nor the approval of any Person other than the Sellers is necessary to convey, transfer and assign to Purchaser all right, title, and interest in and to the Intellectual Property free and clear of any Liens or Liabilities.

**Section 3.3    Consents and Approvals**. None of the execution, delivery of, or performance under the Operative Documents by either Seller, nor the consummation of the Transactions by either Seller, will: (a) contravene, conflict with, or result in a violation of any of the provisions of the organizational documents of the Company; (b) to the best of Seller's knowledge, contravene, conflict with, or result in a violation of any Law to which either Seller or the Intellectual Property is subject; (c) to the best of Seller's knowledge, conflict with, create a breach or default under, require any consent of or notice to, or give to any Person any right of modification, acceleration, or cancellation, or result in the creation of any Lien upon any asset pursuant to, any contract or permit to which either Seller is a party or by which  either Seller or

6

the Intellectual Property may be bound, affected, or benefited; (d) allow the imposition of any fees or penalties or require the offering or making of any payment to any Person on the part of either Seller; or (e) result in the creation of any Lien on any Intellectual Property.  No consent, waiver, approval, permit, or authorization of, or registration, qualification, designation, declaration, filing or waiting period with, or notification to, any Person is required on the part of either Seller in connection with the execution and delivery by either Seller of any Operative Documents, or the compliance by or performance of either Seller with any of the provisions thereof, or the consummation of the Transactions, including assignments from co-inventors of any patents or patent applications.

Section 3.4     **Title to Assets**. The Sellers have sole and exclusive, good, and marketable title, free and clear of all Liens, to all Intellectual Property.  Pursuant to this Agreement and the Operative Documents, the Purchaser will acquire good and valid title to, free and clear of any Liens, the Intellectual Property.

Section 3.5     **Litigation**. There is no, and has not been for the past three years, any action, order, claim, suit, proceeding, litigation, investigation, inquiry, review, or notice ("Proceeding") pending or threatened against, relating to or affecting the Intellectual Property.   There are no unsatisfied judgments, penalties, or awards against, relating to, or affecting either Seller.

Section 3.6     **Intellectual Property**. The Intellectual Property constitutes all the intellectual property used by or for the benefit of the Purchaser in connection with its business.

(a)     All issued registrations and pending applications for issued patents, pending patent applications, and registered copyrights and domain names listed on Schedule 3.6(a) are included in the Intellectual Property, and are owned exclusively by the Sellers free and clear of all Liens.

(b)     The Sellers have taken all reasonable or prudent steps to protect the Sellers' rights in the Intellectual Property. Each employee, independent contractor, consultant or other Person who has developed, worked on, revised, reviewed or has had any other material role in connection with the creation of any portion of the Intellectual Property has executed an enforceable agreement assigning any right in the Intellectual Property to a Seller, which agreements are all listed on Schedule 3.6(b). The Sellers have the valid and continuing right to use all Intellectual Property without infringing on or otherwise acting adversely to the rights or claimed rights of any Person, and no Seller is obligated to pay any royalty or other consideration to any Person in connection with the use of any Intellectual Property.

(c)     The Sellers are exercising a degree of care that is consistent with the standards of the industry in which they operate (but in no event less than a reasonable degree of care) in order to protect the secrecy and maintain the confidentiality of all the Intellectual Property that are the subject of the Agreement.  No trade secret that is included in the Intellectual Property Rights that are the subject of the License Agreement has been disclosed or authorized to be disclosed to any third party as the case may be, or interests in and to such trade secrets.  No Person is infringing the rights of either Seller in any Intellectual Property.  Schedule 3.6(c) sets out a complete list of any Contract binding upon either Seller which (i) purports to involve a Seller's assignment of any intellectual property or inventions, (ii) contains any non-competition or similar

7

obligation, or (iii) limits the use or disclosure of any confidential information (of any Person) by either Seller.  Schedule 3.6(c) also discloses all persons and entities that have been granted access to any of the Intellectual Property and provides copies of any non-disclosure agreements (NDAs), licenses, commercial agreements, or other IP Agreements executed in connection with the Intellectual Property.

(d)     The Intellectual Property (including its development, research, manufacturing, commercialization and exploitation) to the best of Seller's knowledge does not infringe, misappropriate or violate any rights of third parties with the development, research, manufacturing and/or commercialization of the Intellectual Property and all other know how that comprise this technology and/or any exploitation of the Intellectual Property.

(e)     There are no known infringements, misappropriations or violations by others of any Intellectual Property owned and/or used by Sellers and no written claim challenging the ownership, validity, registrability, enforceability, use or licensed right to use any such Intellectual Property has been made or asserted by third parties against Sellers and remains pending as of the date hereof.

(f)     All registrations of the Intellectual Property are valid and in force and the intellectual property underlying such registrations is used in material compliance with all applicable laws.

(g)     All compensations, fees or other payments payable under any applicable laws or agreements by the Company, to each employee inventor of any Intellectual Property that are the subject of the Agreement have been duly paid.

(h)     The Intellectual Property under the Agreement, including all patents listed in Schedule 2 thereto and know-how described therein, comprise all industrial and intellectual property rights of whatever nature necessary to develop the technology into a product that can be commercialized by Purchaser in connection with its business and its intended commercial purpose.

(i)     Notwithstanding any other language contained in Section 3.6 above, Sellers make no representation or warranty of any kind, either express or implied, with respect to the merchantability, fitness for a particular purpose, nor any warranty arising out of prior course of dealing and usage of trade with respect to the Intellectual Property.  The Purchaser expressly acknowledges that it has been given any and all information, resources and time necessary to conduct all due diligence necessary to make a decision to purchase the Intellectual Property in connection with this Agreement.

**Section 3.7     Representations Concerning the Issued Shares**.

(a)     Owner understands that the Issued Shares are subject to restrictions on transfer, including restrictions set forth in the Stockholders' Agreement and under applicable Law.

(b)     Owner acknowledges that he has received or has access to all information which it, he or she considers necessary or advisable to enable him to make a decision concerning an investment in Purchaser. Owner represents and warrants that he has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks

4816-9282-0869.4

of investing in Purchaser and is able to bear the economic risk of investing in Purchaser. Owner understands that an investment in Purchaser is speculative and that Owner could lose his entire investment.

(c)     Additionally, Owner acknowledges and agrees that he is not relying on any projections or management presentation provided by or on behalf Purchaser, or on any statements concerning Purchaser not set forth in this Agreement.

(d)     Owner is acquiring the Issued Shares solely for his own account, for investment purposes only, and with no view toward the resale or further distribution thereof, in whole or in part. Owner acknowledges that he is not relying upon any representation by any other person in making the investment decision concerning Purchaser.

(e)     Owner understands and acknowledges that the Issued Shares have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or any state securities law and are being issued in reliance upon one or more exemptions from registration contained in such laws (including the exemption afforded by Section 4(a)(2) of the Securities Act) and that Purchaser's reliance upon such exemptions is based in part on the representations and agreements made by Owner herein.

(f)     Owner understands and acknowledges that the Issued Shares are not likely to be readily marketable and that he must hold the Issued Shares indefinitely, assuming the entire risk of investment therein, unless they are subsequently registered under the Securities Act and any applicable state securities law or an exemption from registration exists.  Owner understands and acknowledges that the Issued Shares may lose some or all of their value.

(g)     Owner understands and agrees that the Issued Shares shall be subject to certain additional restrictions on transfer and options to purchase that will be imposed upon the Issued Shares pursuant to the [Stockholders' Agreement], to which Owner is executing a valid and binding joinder.

(h)     Owner represents that (i) Owner is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act, (ii) the information verifying the same providing by Owner to Purchaser is complete and accurate as of the date hereof, and (iii) Owner has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the investment in Purchaser and making an informed investment decision with respect thereto.

## ARTICLE 4
## COVENANTS

**Section 4.1    Announcements**. No Party shall issue any press release or make any public statement with respect to this Agreement or the Transactions without obtaining the prior written approval of the other.

**Section 4.2    Confidentiality**.  From and after the Closing, Sellers and their Affiliates shall keep confidential all, and shall not divulge to any other Person any, (a) of the trade secrets or private or confidential information relating to the Intellectual Property or Purchaser including

4816-9282-0869.4

private, secret, and confidential information relating to such matters, or (b) of the terms of the Transactions, including the disclosure of any Operative Document, unless such information (i) is or becomes generally available to the public other than as a result of a disclosure (whether advertent or inadvertent) by either Seller, or the agents or Affiliates of either Seller, or (ii) is compelled to be disclosed by Law or by a judicial, administrative, or regulatory authority; provided, however, that Sellers shall provide Purchaser with prompt written notice of such legal compulsion so that Purchaser may seek a protective order or other available remedy.

**Section 4.3    Update of Representations and Warranties**.  If any representation or warranty in Article 3 becomes untrue prior to the Closing Date, Sellers shall deliver written notice to Purchaser identifying in reasonable detail the facts causing such representation and warranty to be untrue.

## ARTICLE 5
## SURVIVAL AND INDEMNIFICATION

**Section 5.1    Survival**. The representations and warranties made in this Agreement shall survive the Closing for a period of four years; provided that any claim based upon fraud or any claim constituting a breach of the representations contained in Section 3.1 (*Organization; Good Standing*), Section 3.2 (*Authority*), Section 3.4 (*Title to Assets*), and Section 3.6 (*Intellectual Property*) (collectively, the "Fundamental Representations") shall survive until the expiration of the statute of limitations period applicable to the matters covered thereby. This Section 5.1 shall not limit any covenant or agreement of the Parties that contemplates performance after the Closing. If any Party gives notice of any claim against any other Party in writing prior to the expiration of the applicable period described by this Section 5.1, such claim shall survive until resolved in accordance with the procedures set forth below.

**Section 5.2    Indemnification**. Sellers shall jointly and severally defend, indemnify and hold Purchaser and its Affiliates, officers, directors, managers, members, agents, attorneys, and accountants ("Purchaser Indemnitees") harmless for, from, and against any and all Losses directly or indirectly resulting from, relating to or arising out of: (i) any breach or nonperformance (partial or total) of or inaccuracy in any representation or warranty of either Seller, (ii) any failure to perform any covenant or agreement of either Seller contained in any Operative Document (including the obligation to produce any item required to be delivered at or after Closing); and (iii) any Excluded Liabilities.

**Section 5.3    Limit of Liability**.  In no event will the Sellers be liable to the Purchaser (or its affiliates or sublicensees) in connection with this Agreement for lost revenue, lost profit, lost savings, loss of use, damage to goodwill, or any consequential, incidental, special, exemplary, punitive or indirect damages under any theory, including contract, negligence, or strict liability, even if that party has been placed on notice of the possibility of such damages, in an amount greater than the Purchaser's payments to the Sellers under the terms of this Agreement.

## ARTICLE 6
## GENERAL PROVISIONS AND OTHER AGREEMENTS

**Section 6.1     Notices**.  All notices and other communications under this Agreement must be in writing and will be deemed given (a) when delivered personally, (b) on the fifth Business Day after being mailed by certified mail, return receipt requested, (c) the next Business Day after delivery to a recognized overnight courier, or (d) upon transmission and confirmation of delivery if sent by email, to the Parties at the following addresses (or to such other address as such Party may have specified by notice given to the other Parties pursuant to this <u>Section 6.1</u>):

| | | |
|---|---|---|
| (i) | If to Purchaser: | Arkade, Inc. <br> 7040 Jellico Ave. <br> VanVuys, CA 92460 <br> Attention: Joel Kort <br> Email: joel@arkade.games |
| | With a copy, which shall not constitute notice, to: | Foley & Lardner, LLP <br> 3579 Valley Centre Dr. <br> San Diego, CA 92130 <br> Attention: Paul S. Hunter, Esq. <br> Email: phunter@foley.com |
| (ii) | If to Seller: | DigiBit LLC <br> 15074 Cranbrook Court <br> Shelby Township, MI 48315 <br> Attention: Colt Correa <br> Email: coltcorrea@mydigibit.com |
| | With a copy, which shall not constitute notice, to: | Stroble & Sharp, P.C. <br> 300 East Long Lake Road, Suite 200 <br> Bloomfield Hills, MI 48304 <br> Attention: Paul M. Kavanaugh, Esq. <br> Email: pkavanaugh@stroblpc.com |

**Section 6.2     Amendment; Waiver**. This Agreement shall not be amended, modified, or supplemented except by a written instrument signed by the Parties.  No waiver of this Agreement, or of any term or provision hereof, shall be effective unless such waiver is made in writing by the Party against whom the waiver is to be enforced.  No waiver of any provision hereunder, or any breach or default thereof, shall extend to or affect in any way any other provision or prior or subsequent breach or default.

**Section 6.3     Assignment**. No Party may assign any of its rights or obligations under this Agreement without the prior written consent of the other Parties. Notwithstanding the foregoing, this Agreement may be assigned by Purchaser, with notice to Owner but without either Seller's consent, in whole or in part, to (a) one or more of Purchaser's Affiliates, (b) any Person in

connection with the sale of all or substantially all the assets of Purchaser to such Person, (c) any Person who acquires all or substantially all of the equity interests of Purchaser, including by merger or consolidation, or (d) as collateral to Purchaser's secured lenders.

**Section 6.4    Entire Agreement**. This Agreement, together with all Schedules and Exhibits hereto and the other Operative Documents, contain the entire understanding of the Parties with regard to the subject matter contained herein or therein, and supersede all other prior representations, warranties, agreements, understandings, or letters of intent between or among any of the Parties or their respective Affiliates with respect to the subject matter hereof. The submission of a draft of this Agreement or portions or summaries thereof does not constitute an offer to purchase or sell the Assets, it being understood and agreed that neither Purchaser, nor Seller shall be legally obligated with respect to such a purchase or sale or to any other terms or conditions set forth in such draft or portion or summary unless and until this Agreement has been duly executed and delivered by all Parties.

**Section 6.5    Parties in Interest**. This Agreement shall inure to the benefit of and be binding upon the Parties and their successors and permitted assigns. Nothing in this Agreement, express or implied, shall confer upon any Person other than the Parties or their successors, or permitted assigns, any rights or remedies under or by reason of this Agreement, except that the Purchaser Indemnitees shall be entitled to rely and enforce the provisions of Article 5.

**Section 6.6    Fees and Expenses**. Except as otherwise expressly provided in this Agreement, all costs and expenses incurred in connection with this Agreement and the Transactions shall be borne by the Party incurring such expenses.

**Section 6.7    Waiver of Jury Trial**. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH OF THE PARTIES EXPRESSLY AND IRREVOCABLY HEREBY WAIVES, AND AGREES TO CAUSE EACH OF ITS AFFILIATES TO WAIVE, AND COVENANTS THAT NEITHER IT NOR ANY OF ITS AFFILIATES SHALL ASSERT (WHETHER AS PLAINTIFF, DEFENDANT, OR OTHERWISE) ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY DISPUTE DESCRIBED IN SECTION 6.9 (WHETHER IN CONTRACT OR TORT OR OTHERWISE).  ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 6.7 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

**Section 6.8    Mutual Drafting**. The Parties have been represented by counsel who have carefully negotiated the provisions hereof. As a consequence, the Parties do not intend that the presumptions of any Laws relating to the interpretation of contracts against the drafter of any particular clause should be applied to the Operative Documents. The provisions of the Operative Documents shall be interpreted in a reasonable manner to effectuate the intent of the Parties.

**Section 6.9    Governing Law; Arbitration**. This Agreement shall be governed by the Laws of the State of Delaware.  Any controversy or claim arising out of or relating to this Agreement, its creation, implementation, termination,  or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial  Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be

12

entered in any court having jurisdiction thereof. Such an arbitration shall be conducted in Los Angeles, California. The parties further agree that the arbitrator(s) shall have not less than 15 years' experience in dealing with intellectual property issues.

**Section 6.10   Counterparts**. This Agreement may be executed in counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement and shall become binding when one or more counterparts have been signed by each of the Parties and delivered to Purchaser and Seller.

**Section 6.11   Severability**. The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, to the extent valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof in any other jurisdiction.

**Section 6.12   Interpretation**. In the interpretation of this Agreement, except where the context otherwise requires, (a) "including" or "include" does not denote or imply any limitation, (b) "or" has the inclusive meaning "and/or," (c) "$" refers to U.S. dollars, (d) the singular includes the plural, and vice versa, and each gender includes the other gender and the neuter, and the neuter includes each gender, (e) captions or headings are only for reference and are not to be considered in interpreting this Agreement, (f) "Section" refers to a section of this Agreement, unless otherwise stated in this Agreement, (g) "Exhibit" or "Schedule" refers to an exhibit or schedule, as applicable, to this Agreement (which is incorporated by reference), unless otherwise stated in this Agreement, and (h) "day" refers to a calendar day unless expressly identified as a Business Day.

**[Signature Page Follows]**

4816-9282-0869.4

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date first written above.

PURCHASER:

Arcade, Inc.

By: _Joel Kort_
Name: Joel Kort
Title: CEO

THE COMPANY:

DigiBit LLC

By: _Colt Correa_
Name: Colt Correa
Title: President

OWNER:

_Colt Correa_

Colt Correa

**Annex I**

**Defined Terms**

"<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person at any time during the period for which the determination of affiliation is being made. The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to elect or appoint a majority of the board of directors (or other governing body) or to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract, or otherwise.

"<u>Agreement</u>" has the meaning set forth in the Preamble.

"<u>Business Day</u>" means any day other than a Saturday, a Sunday, or a day on which the Federal Reserve Bank of New York, New York is closed.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Contract</u>" means any oral or written contract, agreement, lease, commitment, understanding, instrument, license, guarantee, bid, or other arrangement (and proposal to enter into any of the foregoing).

"<u>Governmental Body</u>" means any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency, authority or instrumentality, domestic or foreign or quasi-governmental body.

"<u>Law</u>" means any foreign, federal, state, or local law (including common law), statute, code, ordinance, rule, regulation, treaty, ruling, judgment, order, or other requirement.

"<u>Liability</u>" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including all costs and expenses relating thereto and any liability for Taxes.

"<u>Liens</u>" means all mortgages, deeds of trust, claims, liens, security interests, pledges, leases, conditional sale contracts, rights of first refusal, options, charges, Liabilities, obligations, agreements, easements, rights-of-way, powers of attorney, limitations, reservations, restrictions, and other encumbrances of any kind.

"<u>Loss</u>" or "<u>Losses</u>" means all losses, Liabilities, claims, obligations, deficiencies, demands, Taxes, judgments, and damages interest, fines, enhanced penalties, suits, actions, causes of action, assessments, awards, costs, and expenses (including costs of investigation and defense and reasonable attorneys' and other professionals' fees).

"<u>Operative Documents</u>" means this Agreement, the License and Consulting Agreement, and all other agreements, instruments, documents, and certificates executed and delivered or

4816-9282-0869.4

required to be delivered by or on behalf of Sellers or Purchaser pursuant to or in connection with this Agreement.

"Person" means an individual, partnership, joint venture, corporation, limited liability company, bank, trust, unincorporated organization, or Governmental Body.

"Purchaser" has the meaning set forth in the Preamble.

"Restricted Territory" means any state of the United States of America.

"Sellers" has the meaning set forth in the Preamble.

"Stockholders' Agreement" means the agreement by and between Purchaser and founders and other stockholders of Purchaser who become party to the agreement.

"Source Code" means the human readable source code of the Software to which it relates, in the programming language in which the software was written, together with all related flow charts and technical documentation, including a description of the procedure for generating object code, all of a level sufficient to enable a programmer reasonably fluent in such programming language to understand, build, operate, support, maintain, and develop modifications, upgrades, updates, adaptations, enhancements, new versions, and other derivative works and improvements of, and to develop computer programs compatible with, the Software.

"Transactions" means the sale and purchase of the assets and the performance of the other covenants described or otherwise contemplated by the Operative Documents and all transactions arising out of or relating thereto.

4816-9282-0869.4

Exhibit 1.6(b) Recordable Assignment from DigiBit LLC and Colt Correa

[Attached.]


Schedule 1 Software

[Provided by Seller.]


Schedule 2 Patents

- U.S. Provisional Patent Application No. 62/723,177 filed on August 27, 2018 entitled "Electronic Motion Sensing Device"

- PCT Application No. PCT/US18/55306 filed on October 10, 2018 entitled "Electronic Motion Sensing Devices and Method of Operating the Same"

- U.S. Patent Application No. 16/157,029 filed on October 10, 2018 entitled "Electronic Motion Sensing Devices and Method of Operating the Same"

- U.S. Patent Application No. 15/238,307 filed on August 16, 2016 entitled "Game Communication Assembly and Method of Operating Same"


Schedule 2.2(d)

| | |
|---|---|
| 10/24/2018 | -6,000.00 |
| 12/17/2018 | -3,500.00 |
| 01/14/2019 | -3,500.00 |
| **TOTAL** | **-13,000** |

<u>Schedule 3 Trade Secrets</u>

[Provided by Seller.]

<u>Schedule 1.6(a) Wire Instructions</u>

████████████████

Routing Number for Wire Transfers: ██████████

Account Name: ████████████████████████████████

Account Number: ██████████

Client Name: ██████████

Client Ref. No.: ████████

<u>Schedule 3.6(a) Intellectual Property</u>

See Schedule 2 for a complete list of all patent applications and patents.

1.  The following is a list of all inventors of the IP.

    Colt Correa, Amy Correa, Caleb Correa, Lydia Correa, Uzair Muhammad

2.  The following is a list of all persons who worked on the IP, including contractors, paid or unpaid.

    Colt Correa, Amy Correa, Caleb Correa, Lydia Correa, Muhammad Uzair, M.A.K.S Inc., One China PCB Company, we.R.play

3.  The following is a list of all persons who were provided access to the IP in any form.

    Colt Correa, Amy Correa, Caleb Correa, Lydia Correa, Muhammad Uzair, M.A.K.S Inc., One China PCB Company, we.R.play

<u>Schedule 3.6(b) Assignments for Intellectual Property</u>

[ Sellers to include. Must include assignment of IP from all inventors.]

<u>Schedule 3.6(c) Contracts Binding on either Seller, List of Disclosures, Copies of Agreements</u>

1.  The following is a list of all persons and entities granted access to any of the IP.

    Colt Correa, Amy Correa, Caleb Correa, Lydia Correa, Muhammad Uzair, M.A.K.S Inc., One China PCB Company, we.R.play

2.  The following is a list of all NDA, licenses, commercial agreements, or other IP Agreements, and copies thereof, executed.

    NDA with One China PCB Company
    NDA with Muhammad Uzair
    NDA with we.R.play
    DigiBit Agreement with Muhammad Uzair

<u>Appendix A – Opinion of Counsel referenced in Section 2.5(d)</u>

Exhibit 5

## LICENSE AGREEMENT

This License Agreement ("License Agreement") , effective as of April 20, 2019 (the "Effective Date"), is entered into by and among DigiBit, LLC with its address at 15074 Cranbrook Court, Shelby Township, MI 48315 ("DigiBit"), and Arkade, Inc. ("Arkade") with its address at 7040 Jellico Ave. Van Nuys, CA 91406. DigiBit and Arkade may be referred to individually as "Party" or collectively as "Parties."

WHEREAS, the Parties entered into the INTELLECTUAL PROPERTY PURCHASE AGREEMENT ("IP Purchase Agreement") dated February 20, 2019;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the Parties agree as follows:

1. <u>Definitions.</u>

    **a. "Intellectual Property"** means, to the extent owned by DigiBit, all: (a) (i) object code necessary for the Arkade Blaster to perform its functions, and (b) all example apps in executable form and games used to aid in selling of Arkade products, (c) any applications programming interfaces ("APIs") needed for developers to adapt games or applications to support Arkade products. (d) any databases or data compilations that contain Arkade's customer's information. (e) United States Patent Applications 15/238,307, 16/157,209, 62/723177, PCT Application PCT/US18/55306, all patents that issue from such patent applications (including, without limitation, registrations, all reissues, continuations, divisions, continuations-in-part, renewals or extensions thereof), ("Patents"), and any patents or patent applications from which any Patents claim priority or that claim priority from any Patents, and all inventions disclosed in any of the foregoing (collectively "Acquired Patents"). (f) Electronic printed circuit board designs or schematics including those with accelerometer sensors, gyroscope sensors, batteries, rechargeable batteries, or wireless communications.

    **b. "Law"** means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, or other requirement or rule of any federal, state, local, or foreign government or political subdivision thereof, or any arbitrator, court or tribunal of competent jurisdiction.

    **c. "DigiBit Bank Account"**

    Routing Number for Wire Transfers:
    Account Name:
    Account Number:
    Beneficiary:
    Beneficiary Address:

**d. "Affiliate"** means, as to any Person, any other Person (a) that directly or indirectly, through one or more intermediaries, Controls or is Controlled by, or is under common Control with, such Person; (b) that directly or indirectly beneficially owns or holds five percent (5%) or more of any class of voting stock of such Person; or (c) five percent (5%) or more of the voting stock of which is directly or indirectly beneficially owned or held by the Person in question.

**e. "License Agreement"** has the meaning set forth in the preamble.

**f. "Business"** "Business" means the design, manufacture, assembly, marketing, and sale of technology in video gaming, e-sports, and related matters.

**h. "Confidential Information"** means any and all information comprised by or relating to the Intellectual Property that is not generally known to the public, including all know-how and Acquired Trade Secrets. Without limiting the foregoing, Confidential Information includes the terms and existence of this License Agreement.

**i. "Control"** means the possession of the full right, power, and ability (whether by ownership, license, or otherwise) to grant the assignment set forth in this License Agreement pursuant to the terms and conditions hereof, including the assignment of rights of access to and possession and use of the Intellectual Property and all other and additional rights and privileges under any and all intellectual property rights relating thereto, without requiring a third party's consent or violating or threatening to violate any applicable Law, agreement, arrangement, or obligation (whether absolute or contingent, matured or unmatured) existing at the time of such grant. "Controlled", "Controls", and "Controlling" have correlative meanings.

**j. "Licensed Products"** means any products or services for manufacture, advertising, marketing, distribution or sale that use any Intellectual Property pursuant to the License.

**k. "Person"** means an individual, corporation, partnership, joint venture, limited liability company, governmental authority, unincorporated organization, trust, association, or other entity.

**l. "Blaster Game Product"** any product that resembles a blaster or gun and also is intended to be used in conjunction with a mobile game.

2. The Parties entered into the LICENSE AND CONSULTING AGREEMENT dated February 20, 2019. The Parties agree that this same LICENSE AND CONSULTING AGREEMENT dated February 20, 2019 is terminated with the execution of this License Agreement and that this License Agreement supersedes the LICENSE AND CONSULTING AGREEMENT as if the LICENSE AND CONSULTING AGREEMENT was never executed.

3. License Grant. DigiBit grants to Arkade, as of December 30, 2018, and remain in effect through the Closing Date as defined in the IP Purchase Agreement (or, if no Closing Date occurs, January 31, 2020) (the "License Term"), an non-exclusive, non-sublicensable, non-transferable, limited license to use the Intellectual Property anywhere in the world (the "License").

4. Non-compete. DigiBit agrees to make no attempt to develop, manufacture or market any Blaster Game Product during the License Term.

5. Expense Payment. Arkade, Inc. shall pay DigiBit $15,000 on or before June 15, 2019 for expenses incurred by DigiBit related to Arkade, Inc.

6. Royalties.
    a. In exchange for the License Grant, Arkade shall be able to manufacture and/or sell the first 500 units of Licensed Product royalty free.
    b. In exchange for the License Grant, Arkade shall pay to DigiBit a royalty of $1.00 per unit of Licensed Product after the first 500 units set forth in paragraph 5 above, for each Licensed Product manufactured by or for Arkade incorporating the Intellectual Property under the terms of this License Agreement. All royalty payments shall be paid directly to the DigiBit Bank Account before the manufacturing of the products occur. Arkade shall notify DigiBit not less than 10 business days prior thereto to prepare the Licensed Product for manufacture.

7. Arkade Support. DigiBit will continue to support Arkade's product development and release efforts for the remainder of 2019. This includes training and helping an Arkade hired developer at Arkade's request. Arkade will compensate DigiBit for these efforts on mutually agreeable terms. After manufacturing occurs, Digibit will provide Arkade with a list of serial numbers or other unique identifiers associated with the firmware on the products.

8. REPRESENTATION AND WARRANTY. DIGIBIT MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EITHER EXPRESSED OR IMPLIED, WITH RESPECT TO THE MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NOR ANY WARRANTY ARISING OUT OF PRIOR COURSE OF DEALING AND USAGE OF TRADE WITH RESPECT TO THE INTELLECTUAL PROPERTY. ARKADE EXPRESSLY ACKNOWLEDGES THAT IT HAS BEEN GIVEN ANY AND ALL INFORMATION, RESOURCES AND TIME NECESSARY TO CONDUCT ALL DUE DILIGENCE NECESSARY TO MAKE A DECISION TO LICENSE THE INTELLECTUAL PROPERTY IN CONNECTION WITH THIS LICENSE AGREEMENT.

9. Entire Agreement. This License Agreement, together with the IP Purchase Agreement dated February 20, 2019, and the IP Purchase Agreement Amendment dated April 20, 2019, reaffirms the entire understanding of the Parties with regard to the subject matter

contained herein or therein, and supersedes all other prior representations, warranties, agreements, understandings, or letters of intent between or among any of the Parties or their respective Affiliates with respect to the subject matter hereof.  With regard to conflicts in terms, this License Agreement shall take precedence over the IP Purchase Agreement and the IP Purchase Agreement Amendment.

10. *Governing Law; Jurisdiction.* *THIS LICENSE AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF MICHIGAN. THE PARTIES SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE STATE COURTS LOCATED IN MICHIGAN OR THE COURTS OF THE UNITED STATES LOCATED IN THE DISTRICT OF EASTERN MICHIGAN, SOUTHERN DIVISION IN RESPECT OF THE INTERPRETATION AND ENFORCEMENT OF ANY OPERATIVE DOCUMENT. THE PARTIES HEREBY WAIVE, AND AGREE NOT TO ASSERT, ANY DEFENSE IN ANY ACTION FOR THE INTERPRETATION OR ENFORCEMENT OF ANY OPERATIVE DOCUMENT THAT (a) THEY ARE NOT SUBJECT TO SUCH JURISDICTION, (b) SUCH ACTION MAY NOT BE BROUGHT OR IS NOT MAINTAINABLE IN SUCH COURTS, (c) ANY OPERATIVE DOCUMENT MAY NOT BE ENFORCED IN OR BY SUCH COURTS, (d) THEIR PROPERTY IS EXEMPT OR IMMUNE FROM EXECUTION, (e) THE ACTION IS BROUGHT IN AN INCONVENIENT FORUM, OR (f) THE VENUE OF THE ACTION IS IMPROPER. PURSUANT TO FED.R.CIV.P. 4(D), SERVICE OF PROCESS WITH RESPECT THERETO MAY BE MADE UPON EACH PARTY BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH PARTY AT ITS ADDRESS.*

IN WITNESS WHEREOF, the Parties have duly executed and delivered this License Agreement by their respective officers thereunto duly authorized as of the Effective Date.

[Signature Page Follows]

ARKADE:
Arkade, Inc.

By: _Joel Kort_

Name: JOEL KORT

Title: CEO

DIGIBIT:
DigiBit LLC

By: _____

Colt Correa
Member

Exhibit 6

IP PURCHASE AGREEMENT AMENDMENT #1

This IP Purchase Agreement Amendment ("IP Purchase Agreement Amendment"), effective as of April 30, 2019 (the "Effective Date"), is entered into by and among DigiBit, LLC with its address at 15074 Cranbrook Court, Shelby Township, MI 48315 ("DigiBit"), and Arkade, Inc. ("Arkade") with its address at 7040 Jellico Ave. Van Nuys, CA 91406. DigiBit and Arkade may be referred to individually as "Party" or collectively as "Parties."

WHEREAS, the Parties and Colt Correa entered into the INTELLECTUAL PROPERTY PURCHASE AGREEMENT dated February 20, 2019 ("IP Purchase Agreement");

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the Parties agree as follows:

1. Ongoing Expenses: The Parties agree that section 2.2(d) shall be removed from the IP Purchase Agreement. Any and all payments to reimburse DigiBit for expenses shall not be credited toward the Payment.

2. IP Purchase Agreement Payment. In reference to the Payment as defined in Section 2.2 of the IP Purchase Agreement, Arkade agrees to pay DigiBit by a transfer of all funds of the Purchase Price directly to the DigiBit Bank Account. Arkade agrees that the transfer of funds to the counsel, Strobl & Sharp, P.C. is not necessary. The Closing Date shall be 5 business days after the date the "Payment" is received into the DigiBit Bank Account, having the following wire transfer details:

Routing Number for Wire Transfers: ▮▮▮▮▮
Account Name: ▮▮▮▮
Account Number: ▮▮▮▮▮
Beneficiary: ▮▮▮▮
Beneficiary Address: ▮▮▮▮▮▮▮▮▮▮

3. Review of the Intellectual Property. DigiBit agrees to give a person (the "Reviewer") assigned by Arkade Inc. read-only access to the Intellectual Property 10 days before the Closing Date (5 days before the transfer of all funds of the "Purchase Price") to review the Intellectual Property. DigiBit will provide an expert and at least 2, 1 hour recorded online meetings with the Reviewer. The Reviewer must be a United States citizen with residence in the United States.

4. Parties. In reference to the IP Purchase Agreement, DigiBit and Arkade release Colt Correa from any obligations, responsibilities, warranties and/or liabilities created by the IP Purchase Agreement. The Parties hereto acknowledge that the IP Purchase Agreement was created and exists as if Colt Correa was never a party thereto.

IN WITNESS WHEREOF, the Parties have duly executed and delivered this IP Purchase Agreement Amendment by their respective officers thereunto duly authorized as of the Effective Date.

ARKADE:
Arkade, Inc.

By: _Joel Kort_

Name: JOEL KORT

Title: CEO

DIGIBIT:
DigiBit, LLC

Colt Correa
Member

Exhibit 7

**Registration Number**

# TX 8-916-693

**Effective Date of Registration:**
December 05, 2020
**Registration Decision Date:**
December 08, 2020

## Title _____

Title of Work:    DigiBit Connect App

## Completion/Publication _____

Year of Completion:    2019
Date of 1st Publication:    June 16, 2019
Nation of 1st Publication:    United States

## Author _____

- Author:    DigiBit LLC
Author Created:    computer program
Work made for hire:    Yes
Domiciled in:    United States

## Copyright Claimant _____

Copyright Claimant:    DigiBit LLC
15074 Cranbrook Court, Shelby Township, MI, 48315, United States

## Rights and Permissions _____

Organization Name:    Simonelli IP, PLLC
Name:    David Simonelli
Email:    david@simonelliip.com
Telephone:    (248)252-7435
Address:    PO Box 935
Birmingham, MI 48012 United States

## Certification _____

**Name:** David Simonelli
**Date**: December 05, 2020
**Applicant's Tracking Number**: 0110.3009.1

Exhibit 8

